WILENCHIK & BARTNESS
A PROFESSIONAL CORPORATION

ATTORNEYS AT LAW
The Wilenchik & Bartness Building
2810 North Third Street  Phoenix, Arizona  85004

Telephone:  602-606-2810          Facsimile:  602-606-2811

Dennis I. Wilenchik, #005350
Brian J. Hembd, #029817
David A. Timchak, #032095
admin@wb-law.com
*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| **Dennis M. Danzik, an Arizona citizen; and RDX Technologies Corporation (fka Ridgeline Energy Services, Inc.), a British Columbia Canadian Corporation** | Case No. |
| **Plaintiffs,** | **COMPLAINT** |
| **v.** | **JURY TRIAL DEMANDED** |
| **CWT Canada II Limited Partnership, an Ontario, Canada Limited Partnership; Resource Recovery Corporation, a Delaware Corporation; Changing World Technologies, a Delaware limited Partnership; Jean Noelting and Jane Doe Noelting; and Bruce MacFarlane and Jane Doe MacFarlane; Brian Appel and Jane Doe Appel** | |
| **Defendants** | |

Plaintiffs Dennis Danzik and RDX Technologies Corporation ("Plaintiffs") for their

complaint against CWT Canada II Limited Partnership; Resource Recovery Corporation; Jean

Noelting and Jane Doe Noelting; and Bruce MacFarlane and Jane Doe MacFarlane ("Defendants") allege as follows:

**PARTIES**

1.    Plaintiff Dennis Danzik is at all times herein was a resident of Maricopa County, Arizona, many of the events complained of occurred therein.

2.    RDX Technologies Corporation ("RDX"), formerly known as Ridgeline Energy Services, Inc., is a British Columbia Canadian Corporation, with operations in Maricopa County Arizona.

3.    CWT Canada II Limited Partnership ("CWT Canada") is a Limited Liability Partnership incorporated in Delaware with its principal place of business in Toronto, Ontario. For the purposes of diversity jurisdiction, as a limited partnership, the citizenship of CWT Canada is the citizenship of its partners, and all the partners are incorporated and reside in Toronto, Ontario.

4.    Resource Recovery Corporation is a C corporation incorporated in Delaware with its principal place of business in New York.

5.    Changing World Technologies ("CWT LP") is a Delaware limited partnership.

6.    Jean Noelting and Jane Doe Noelting are individuals sued in their marital capacity. Mr. Noelting is also sued in his individual capacity. The conduct of Mr. Noelting as identified herein was undertaken on behalf of the marital community, which can be held liable for it, and Mr. Noelting may also be held liable with respect to his sole and separate property.

7.    Bruce MacFarlane and Jane Doe MacFarlane are individuals sued in their marital capacity. Mr. MacFarlane is also sued in his individual capacity. The conduct of Mr. MacFarlane as identified herein was undertaken on behalf of the marital community, which can be held liable for it, and Mr. MacFarlane may also be held liable with respect to his sole and separate property.

8.    Brian Appel and Jane Doe Appel are individuals sued in their marital capacity. Mr. Appel is also sued in his individual capacity. The conduct of Mr. Appel as identified herein was undertaken on behalf of the marital community, which can be held liable for it, and Mr. Appel may also be held liable with respect to his sole and separate property.

## STATEMENT OF JURISDICTION AND VENUE

9.    Plaintiffs reassert the forgoing paragraphs herein.

10.   Jurisdiction in the United States District Court is proper in this case because there is complete diversity of citizenship between the parties and the amount in controversy, without interests and costs, exceeds the jurisdictional sum specified in 28 U.S.C. § 1332.

11.   Venue in this Court is proper under 28 U.S.C. § 1391(a)(2) because a substantial part of the events and omissions giving rise to the claim arise in whole or in part out of transactions between the plaintiffs and the defendants in Scottsdale, Arizona.

12.   The defendants are subject to personal jurisdiction in Arizona because they contracted for goods and services in Arizona and availed themselves of the benefits and burdens of Arizona law.

## GENERAL ALLEGATIONS

13.   Plaintiffs reassert the forgoing paragraphs herein.

**A. RDX'S CORE BUSINESS**

14.   RDX was first incorporated under the *Business Corporation Act* (Alberta), 17 years ago and has been in business as an Alberta corporation ever since.

15.   RDX over the years grew its business to include operations in Alberta, British Columbia, and the United States. RDX commenced its operations in the Alberta oil industry, referred to as the "oil patch". From its oil patch operations, RDX expanded the scope of its business to include many forms of waste water management. RDX's core business is waste water treatment.

16. Throughout the years, RDX has grown its core business and has serviced customers in various countries, including Canada, the United States, Poland, Africa and Peru. RDX became a publically traded company 9 years ago; RDX trades on the Calgary TSX Venture Exchange.

17. RDX is a company that engineers, designs, develops, manufactures and installs equipment for waste water management. RDX has proprietary technology, machinery and processes. RDX provides solutions for waste water, including septic water and industrial waste water. This is RDX's core business, which has been built up over almost two decades. Danzik Applied Sciences ("DAS") laboratory in Arizona has developed unique and proprietary equipment and technology, which is available to RDX.

18. RDX's waste water treatment systems are leading edge as it relates to their design, size, weight and ability to process a broad array of water contaminants. RDX has also developed leading edge processes for mining waste water. Valuable compounds that are found in waste water are extracted for their commercial value.

19. RDX has spent years developing its technology and developing credibility as a leading edge supplier of waste water solutions. RDX water treatment and management includes advances in situ and during process water treatment, state of the art water mining systems, the No Pump™ Interceptor and Grease Trap Service System, and the Sans Tanker™ Tankless and Tankerless Fluid Transportation System.

20. RDX's unique technology allows for the separation of water and grease, *in situ*, allowing for the water, which comprises the majority of the volume in grease traps, to be reintroduced on site, at the point of pickup, into the municipal waste water. This unique technology allows the grease to be removed in a much smaller tanker, thereby dramatically lowering the transportation and processing costs.

**B. RDX – A SUSTAINABLE BUSINESS MODEL**

21. Prior to 2013, RDX operated at a profit.

4

22.  RDX is in an industry that is in a growth phase and will continue to be in a growth phase. RDX is a specialized company that provides systems and expertise for treating and managing waste water. As environmental concerns become more pronounced and environmental and government regulation becomes more stringent, the demand for treating and managing waste water continues to grow. RDX has developed unique and leading edge technology that it utilizes in its systems that treat waste water.

23.  In the fiscal year ended March 31, 2014, RDX reported revenues of approximately $34 million Canadian, with assets of over $96 million Canadian. For the nine months ended December 31, 2014, RDX's revenues were approximately $18 million dollars Canadian and the assets were $70.8 million dollars Canadian.

## C. EVENTS LEADING TO PRESENT COMPLAINT

### (I.) RDX's Acquisition of Changing World Technologies L.P. ("CWT LP")

24.  RDX's financial problems leading to RDX's application under the CCAA arise from RDX's acquisition of Changing World Technologies L.P. ("CWT LP").

25.  While the core business of RDX is treating waste water and refining waste water, in 2013, RDX ventured into renewable diesel fuels by acquiring CWT LP.

26.  The acquisition of CWT LP by RDX was undertaken to create vertical integration. RDX, specializes in, among other things, recovering grease and other materials from waste waters. The recovered grease can be utilized as the raw material to create renewable diesel. The raw material utilized in the production of renewable diesel is referred to as feedstock.

27.  CWT LP owned and was represented as operating a renewable diesel refinery located in Carthage, Missouri, USA. This refinery was represented as producing on specification renewable diesel.

28. A critical factor in the business related to renewable diesel is the availability of tax credits which are issued by the United States Environmental Protection Agency (the "EPA").

**(II.) CWT LP'S Income**

29. CWT LP's income derives from tax credits and Renewable Identification Numbers ("RINs") that are issued by the United States Federal Government to producers of renewable diesel that *meets* the mandated specifications.

30. The U.S. Environmental Protection Agency, working with the U.S. Internal Revenue Service ("IRS"), promotes the manufacture of Renewable Fuels through its Renewable Fuel Standard Program. The public policy behind the promotion of the manufacturing of renewable fuels is to reduce reliance on imported oil and fuel and to protect the environment by manufacturing fuel from waste materials.

31. Producers of renewable fuels such as CWT LP may make application for two government subsidies which are both governed by statutory and regulatory requirements, that being tax credits and Renewable Diesel Fuels Credits. The most relevant tax credits are the Biodiesel and Renewable Diesel Fuels Credit, which provides tax credits of $1.00 per gallon for the production of renewable diesel or biodiesel. A RIN is assigned to each batch of biorenewable diesel for the purpose of tracking its production, use and trading, as required by the EPA. RIN's can be sold.

32. The IRS defines renewable diesel as liquid fuel from biomass that meets the registration requirements for fuels and fuel additives established by the EPA and the requirements of ASTM D975 or D936.

33. ASTM International ("ASTM") is an international standards organization that sets uniform testing standards for, among other things, products such as renewable diesel. To qualify as renewable diesel, fuel must meet ASTM D975 standard specifications for diesel fuel oil or D936 for fuel oil.

6

34.   In order to establish that the renewable diesel complies with the relevant ASTM standard, in the case of the CWT LP Carthage Missouri Refinery, ASTM D936, and therefore qualifies for credit with the Environmental Protection Agency ("EPA") and qualifies for tax credits with the IRS, the renewable diesel must be tested and approved by the IRS fuel laboratory, and, for the purposes of RINs, an EPA approved laboratory, such as the Brookhaven National Laboratory in New York.

35.   Tax credits and RINs were key revenue streams for CWT LP. Jean Noelting, Bruce MacFarlane and Brian Appel directed RDX to extensive documentation from government entities, including the EPA, and private parties, that was designed to support CWT LP's representations that the renewable diesel produced at CWT LP's Carthage Missouri Refinery was, in fact, eligible for both tax credits and RINs.

36.   CWT LP created thousands of documents known as Certificates of Renewable Diesel. Each one of these Certificates of Renewable Diesel had a Certificate of Analysis on the reverse side of the document. The Certificate of Analysis was test results from Atlantic Product services. This certification was sworn, under penalty of perjury, for every batch of renewable diesel. The certification stated that the renewable diesel met the requirements to qualify for RINs. IRS and EPA regulatory compliance required that every batch of renewable diesel be accompanied by a certification that the renewable diesel met the mandatory requirements to qualify for RINs.

**(III.) Representations by Jean Noelting / Bruce MacFarlane / Brian Appel To Induce RDX To Acquire CWT LP**

37.   Jean Noelting, Bruce MacFarlane and Brian Appel were the senior individuals at CWT LP. They were the individuals with the ultimate authority over all of the CWT LP employees. Jean Noelting, Mark Shoom, Bruce MacFarlane and Brian Appel were the fundamental and primary individuals, as it related to the representations regarding the renewable diesel produced by CWT LP Carthage Missouri Refinery.

7

38.     Key representations relied upon by RDX in its decision to acquire CWT LP were made by Jean Noelting, Bruce MacFarlane and Brian Appel, said representations, included, but were not limited to, the following:

39.     (a.) that CWT LP's Carthage Missouri Refinery (the "CWT LP Carthage Missouri Refinery") produced renewable diesel from waste material; and

40.     (b.) that renewable diesel met the mandated United States Federal Government specifications (ASTM D936) for tax credits and Renewable Identification Numbers ("RINs").

41.     These representations were also made by Mark Shoom, who is the Chairman of Royal Capital Management and Stephen Rider who is the President and CEO of Royal Capital Management. Jean Noelting is the Managing Director of Royal Capital Management. Royal Capital Management is not associated with the Royal Bank, it is a company that trades stock and makes investments and is located in Toronto, Ontario.

42.     CWT LP's income stream was, in large part, derived from tax credits and RINs. CWT LP, under the control and direction of Jean Noelting, Bruce MacFarlane and Brian Appel, received millions of dollars from the US Federal Government for tax credits and RINs.

**(IV.) The March 11, 2013 Unit Purchase Agreement (the "UPA")**

43.     The acquisition of CWT LP by RDX was the subject of a contract titled Unit Purchase Agreement dated March 11, 2013 (the "UPA").

44.     Under the UPA, RDX purchased all of the issued and outstanding units of capital stock in CWT LP from CWT Enterprises (Canada), Inc., Resource Recovery Corporation, GEM Holdco LLC and CWT Canada II Limited Partnership, (collectively the "UPA Sellers") in exchange for promissory note sin the aggregate amount of $20 million dollars and 25,862,069 shares of RDX's common stock.

45. The UPA includes various representations and warranties which were fundamental to the UPA and induced RDX to enter into the UPA, including, but not limited to:

46. (a.) That the Sellers had the absolute and unrestricted right, power and authority to execute and deliver the UPA (per section 3.14) and that doing so would not lead to any challenge or give rise to any legal requirement or order to which the Partnership (as defined in the UPA) or Sellers may be subject (per section 3.2(b)(ii));

47. (b.) That "[n]either the execution and delivery of this [UPA] nor the consummation or performance of any of the Contemplated Transactions will, directly or indirectly …(iv) to the Sellers' Knowledge, case Buyer to become subject to, or to become liable for the payment of, any Tax" (per Section 3.2(b)(iv));

48. (c.) That all tax returns filed by the Partnership are complete and correct and comply with all applicable Legal Requirements; that the Partnership has paid all Taxes that have or could have become due for all periods covered by any tax return or otherwise, and that the Partnership has withheld or collected and paid to the proper Governmental Body or other Person all Taxes required to be withheld, collected, or paid by it (per Section 3.9);

49. (d.) That "[n]either the execution and delivery of this [UPA] nor the consummation or performance of any of the Contemplated Transactions will, directly or indirectly:

50. (A) Breach or give any Governmental Body or other Person the right to challenge any of the Contemplated Transactions or to exercise any remedy or obtain relief under any Legal Requirement or any Order to which the Partnership or any Sellers may be subject;

51. (B) Contravene, conflict with or result in a violation or breach of any of the terms or requirements of, or give any Governmental Body the right to revoke, withdraw, suspend, cancel, terminate or modify, any Governmental Authorization that is held by the Partnership or that otherwise relates to the business of the Partnership (per sections 3.2(b)(ii) and (iii));

9

52.    (e.) That to the Sellers' knowledge, the Partnership has no Liability of the type required to be reflected as a liability on a balance sheet prepared in accordance with GAAP except for Liabilities reflected or reserved against in the Balance Sheet (per section 3.7);

53.    (f.) That the execution or performance of the UPA or the contemplated transaction would not: "directly or indirectly … (v) breach any provision of, or give any Person the right to declare a default or exercise any remedy under, or to accelerate the maturity or performance of, or payment under, or to cancel, terminate or modify, any Partnership Contract" (per Section 3.2(b)(v));

54.    (g.) That CWT LP was in compliance with all outstanding contracts, which would include the SPAN and CWT LP's contracts with customers (per sections 3.10(b)(i)-(ii));

55.    (h.) That no event has occurred or circumstances exists that (with or without notice or lapse of time) may contravene, conflict with or result in a b reach of, or give the Partnership or any other Person the right to declare a default or exercise any remedy under, or to accelerate the maturity or performance of, or payment under, or to cancel, terminate or modify, any Partnership Contract (per section 3.10(b)(iii));

56.    (i.) That no event has occurred or circumstances exists under or by virtue of any Partnership Contract (with or without notice or lapse of time) would cause the creation of any Encumbrance affecting any of the assets of the Partnership (section 3.1(b)(iv));

57.    (j.) All such other express and implied representations and warranties which may appear and be proven at trial.

58.    In Section 3.14 of the UPA, the Sellers further resented that "[n]o representation or warranty or other statement made by the Sellers in this Agreement…contains any untrue statement of material fact or omits to state a material fact necessary to make any of them, in light of the circumstances in which it was made, not misleading in any material respect."

59.    As is found herein, the above written representations were fraudulent.

10

**(V.) The UPA / Promissory Notes**

60.   The amounts due pursuant to the UPA are the subject of two promissory notes. Section 2.2 of the UPA contains the following provision:  2.2Consideration. The consideration for the Units (the "*Purchase Price*") will be the following: a) promissory notes executed by Buyer and payable to each Seller, in the principal amounts set forth on Schedule 2.2 to be delivered at Closing, in the aggregate amount of US $20 million (collectively, the "*Promissory Notes*")….

**(VI.) Problems With The Renewable Diesel**

61.   In April 2013, shortly after RDX completed the purchase of CWT LP, customers who were utilizing the renewable diesel produced at the CWT LP Carthage Missouri Refinery occasioned serious problems with their systems that utilized the renewable diesel.

62.   In or about April 2013, one of the CWT LP Carthage Missouri Refinery's three customers complained about damage to their systems caused by the renewable diesel produced at the CWT LP Carthage Missouri Refinery. A second customer complained about the renewable diesel in May of 2013.

63.   By the end of June 2013, all three of CWT LP's existing customers – Erving Paper Company, APAC, and Omega Proteins - were having problems with their systems that used the renewable diesel from the CWT LP Carthage Missouri Refinery.

64.   RDX had a team assess the problems, make repairs and pay for necessary repairs. RDX technicians found evidence of corrosion in the customers' systems, caused by CWT LP's off-specification renewable diesel.

65.   In 2013, the EPA began what was termed a "Quality Assurance Program" or "QAP" which required that every renewable diesel producer also be certified by an EPA approved service provider. In order to comply with the new EPA program, and because of the complaints from customers regarding the renewable diesel system, RDX engaged

11

Genscape, a respected third party renewable diesel consultant and EPA approved QAP provider to assess the CWT LP Carthage Missouri Refinery's product.

66.    The sample taken from the CWT LP Carthage Missouri Refinery production by Genscape failed the first step in their testing procedure. Genscape then hired a laboratory, Gorge Analytical, to perform an analysis of the product sample, which resulted in the determination by Genscape that the renewable diesel did not qualify for RINs.

67.    In August of 2013, RDX undertook additional tests to determine the pH levels of the renewable diesel produced at the CWT LP Carthage Missouri Refinery. These tests, which, among other things, delineated the chemical species present in the renewable diesel, determined that the pH levels were *hundreds of times* more acidic than on specification renewable diesel.

68.    In September 2013, the main "reactor" at the CWT LP Carthage Missouri Refinery failed. RDX undertook repairs of the failed "reactor" and determined that the reactor was, in fact, devoid of any of the components that should be present in a reactor of this type, and did not contain any components that would be necessary to convert organic waste into renewable diesel.

69.    The vessel described by Jean Noelting, Bruce MacFarlane and Brian Appel as a "reactor" was a large, empty tank, capable of operating under pressure, said tank with a stirring paddle. The tank, which was represented to be a high tech "reactor" by Jean Noelting, Bruce MacFarlane and Brian Appel, *was nothing more than an empty tank with a stirring paddle.*

70.    The high acid content (hundreds of times more acidic than on specification renewable diesel) of the renewable diesel produced at the CWT Carthage Missouri Refinery made it corrosive to the fuel systems of the customers who used the renewable diesel.

**(VI.) RDX Learns Of CWT LP Fraud**

71.   Subsequent to the acquisition of CWT LP, in 2014, highly incriminatory evidence of doctored renewable diesel samples came to light. RDX discovered that every single sample of renewable diesel sent to Brookhaven National Laboratory had been doctored at CWT LP's laboratory in Philadelphia, prior to being sent to Brookhaven National Laboratory.

72.   CWT LP committed fraud, using thousands of falsified documents submitted to the U.S. Federal Government in two ways:

73.   (1.) By submitting altered samples of renewable diesel (purportedly manufactured at the CWT LP Carthage Missouri Refinery) for testing and certification;

74.   (2.) By falsifying official document filings provided to the US Federal Government, stating that CWT LP had produced renewable diesel and, in turn, CWT LP received Federal tax credits for the renewable diesel when, in fact, during that time period, the plant was closed and not producing any renewable diesel.

75.   Contrary to the representations of Jean Noelting, Mark Shoom, Bruce MacFarlane and Brian Appel, the CWT LP Carthage Missouri Refinery was not producing on-specification renewable diesel, it was processing grease by heating it under pressure and adding sulfuric acid. The product produced at the CWT LP Carthage Missouri Refinery was simply a blend of grease and sulfuric acid. This product is combustible; however, it did not qualify as renewable diesel.

**(VIII.) Key Management Provide Evidence of Fraud**

76.   Four key members of management at the CWT LP Carthage Missouri Refinery have come forward and provided detailed evidence in these proceedings regarding the CWT LP fraud.

77.   First, James Saxton, Manager of Refinery Operations, CWT Carthage Missouri Refinery.

13

78.     Mr. Saxton swore an affidavit on April 14, 2015, wherein he states: The samples that were sent to the independent testing laboratories, for investors, customers or investigators, as well as accreditation from Brookhaven National Laboratories represented to be Renewable Diesel produced at the CWT LP Carthage Refinery, were first sent from Carthage Missouri to the CWT LP Laboratory in Philadelphia where the samples were re-refined, and doctored to meet the ASTM specifications. No sample or shipment of fuel from the CWT Carthage Refinery was ever within specification. In fact, some fuel shipments from the CWT Carthage Refinery were so far out of specification that we threw the Carthage fuel away and substituted fuel that was refined solely in the Philadelphia Laboratory. This was done at the direction of CWT LP executive management, including Brian Appel and James Freiss in order to fool investors, customers, Brookhaven, or investigators.

The systematic deception and fraud regarding the Renewable Diesel encompassed years and resulted in thousands of documents that were fraudulently being submitted to the United States Federal Government. Many former CWT LP laboratory technicians left the company due to ethical reasons, primarily after CWT LP executive management would attempt to coerce them into submitting fake laboratory reports.

79.     Second, John Shaw, Operations Manager of CWT LP Carthage Missouri Refinery.

80.     Mr. Shaw swore an affidavit in the New York proceedings (referred to in detail below) where he stated at paragraph 22, the following: In early 2014, I attended a meeting in Scottsdale Arizona where I learned that, prior to being shut down by Danzik, CWT's Philadelphia lab had been doctoring fuel samples. Carthage samples had been further filtered, acid-treated, centrifuged and dehydrated, and combined with (or entirely replaced by) output from the Philadelphia lab's own reactor. These samples were falsely submitted to Brookhaven National Laboratory as representative of the Refinery's product.

81.   Third, Gilbert Talamantez, Refinery Operator at CWT LP Carthage Missouri.

82.   Mr. Talamantez swore an affidavit on April 20, 2015 in this proceeding, which states, among other things, the following: On several occasions, at various times during my employment at CWT LP when Refinery tours were scheduled, I was ordered by John Shaw to run the plant "with water only" or just have the Refinery machinery running with no feedstock going through the plant and make it appear that we were running the Refinery, when in fact it was not operating. All of the operators on shift at that time would be in the control room and everything would look normal to anyone that came through on a tour.

While I never managed or tested the final fuel product, it was a closely held secret that the fuel was not renewable diesel; in fact, it was not diesel at all. When cooled from the heat of the process and put into tanks, the fuel that was produced was a brown smelly paste. The fuel produced went through some basic laboratory testing but was sold to customers anyway as Renewable Diesel.

83.   Fourth, Gregory Ritchie, Lead Process Technician at CWT LP Carthage Missouri Refinery.

84.   Mr. Ritchie swore an affidavit on April 20, 2015 in this proceeding which states, among other things, the following: 4. …the [Refinery] was always in distress and was constantly broke down. My operations manager…. Did not seem to care about housekeeping, except when there was a tour to of the Refinery for investors, or investigators. Then, everyone had to work overtime to get the place cleaned up. On two occasions, when investors came through the Refinery, even if the Refinery would not run on the date of the guess coming through on a tour, all of us were ordered by Shaw to act as if we were working. We just sat there and looked at the controls and tried not to answer any direct questions by people on tour. A lot of times machinery would be running, but empty, or just with water. Shaw and others never left a visitor alone.

I knew that RES made a bad product, and was not diesel. We were not allowed to discuss the fuel quality with any investors or anyone on a Refinery tour. Prior to RDX, no one held quality control meetings. No ASTM Standards were ever presented, or discussed. … We would get in very low-grade feedstock, mostly water, and then try to make a fuel out of it, but it was not really a diesel, just grease.

85. Numerous others have affirmed the same facts.

86. Subsequent to the execution of the UPA, RDX became embroiled in litigation arising out of the UPA, described in detail below. The fundamental and threshold issue in all of the litigation that has taken place since RDX acquired CWT LP is whether or not the product of the CWT LP Carthage Missouri Refinery was "renewable diesel" and was knowingly misrepresented to both to RDX and the US Federal Government. All of the litigation turns on this fundamental threshold issue.

87. As a result of the fraud perpetuated against RDX, litigation has ensued in Calgary, Alberta, Phoenix, AZ, and New York, NY.

88. On March 11, 2013, the same day the UPA was executed, GEM Holdco, LLC, ("GEM") (a UPA Seller) a minority owner of CWT LP, filed a Verified Complaint in the Supreme Court of the State of New York, County of New York, Index No. 650841/2013 against the following parties:

(a.) Changing World Technologies L.P.;

(b.) CWT Canada II Limited Partnership;

(c.) Resource Recovery Corporation.

(the "New York Action").

89. In the New York Action, GEM sought, among other relief, to enjoin the sale of CWT LP to RDX, claiming the CWT LP vendors (the UPA Sellers) were not entitled to sell CWT LP directly to RDX. The New York court denied GEM's motion to enjoin the sale of CWT LP to RDX. GEM's sole grounds for jurisdiction in the New York Court were

16

forum selection clauses found in the Securities Purchase Agreement dated December 21, 2012 (the "SPA") and two related agreements, the Limited Partnership Agreement dated December 21, 2012 (the "LPA") and the Nondisclosure Agreement with myself dated November 19, 2012 (the "NDA").

90.  The Settlement of the New York Action: On September 22, 2014, GEM and RDX settled the New York Action, as between GEM and RDX, by entering into a confidential settlement agreement. This settlement agreement resulted in the New York Court entering a Stipulation of Discontinuance with prejudice on December 3, 2014 as between the following parties:

(a.) GEM Holdco LLC as Plaintiff;

(b.) Gem Ventures, Ltd. as Plaintiff;

(c.) Global Emerging Markets North America, Inc. as Plaintiff;

(d.) Christopher Brown as Plaintiff;

(e.) Edward Tobin as Plaintiff;

(f.) Demetrios Diakolios as Plaintiff;

(g.) Ridgeline Energy Services, Inc. ("Ridgeline" or RDX Technologies Inc. or "RDX") as Defendant;

(h.) Changing World Technologies, LP ("CWT LP") as Defendant;

(i.) Dennis Danzik as Defendant;

(j.) Tony Ker as Defendant; and

(k.) Richard Carrigan as Defendant.

91.  GEM maintained its New York Action against three of the four UPA Sellers, specifically: (a.) CWT Canada II Limited Partnership; (b.) Jean Noelting; (c.) Resource Recovery Corporation.

92.   The Calgary Fraud Action – Filed: August 26, 2014: On August 26, 2014, RDX filed a Statement of Claim in the Court of Queen's Bench of Alberta, under Court File No. 1401-09394 by RDX as Plaintiff, against the following defendants:

(a.) Brian Appel;

(b.) Resource Recovery Corporation;

(c.) CWT Enterprises (Canada), Inc.;

(d.) CWT Canada Limited Partnership;

(e.) Jean Noelting; and

(f.) Bruce MacFarlane.

(the "Calgary Fraud Action").

93.   Twenty-seven (27) days after the Calgary Fraud Action was filed, on September 22, 2014, Jean Noelting and two of the UPA Sellers filed cross-claims and third-party claims in New York Action1 against the following parties: 1 Index No. 650841/2013 (a.) RDX;  (b.) Elizabeth Danzik (Dennis Danzik's wife); (c.) Dennis Danzik; and (d.) Deja II LLC. (the "September 22, 2014 New York Third-Party Action")

94.   The only factor linking RDX to the New York Action is the September 22, 2014 New York Third-Party Action that was filed twenty-seven days after RDX commenced the Calgary Fraud Action.

95.   The original plaintiffs in the New York Action were GEM Holdco, LLC and GEM Ventures Ltd. In GEM's Reply Memorandum of Law in Further Support of the GEM's Parties Motion to Dismiss dated April 7, 2015, on page 1, under the title "Preliminary Statement", GEM submits as follows: "Having failed more than a year ago to get the GEM Parties' claims against them dismissed, the CWT Parties now assert baseless counter-claims and cross-claims that border on nonsensical. Their attempt at playing offense – by invoking the laws of a variety of different jurisdictions, both national and

international – is nothing more than a ploy to muddle the record and raise the GEM Parties' cost of litigation. It should not be tolerated."

**(X.) RDX WAS VIABLE PRIOR TO BEING DEFRAUDED BY CWT LP / UPA SELLERS**

96.    RDX has been in business since it started in Calgary 17 years ago, utilizing its waste water management technology to provide solutions for its customers. RDX has grown its core business over the years and has developed its most valuable asset, its intellectual property, by developing unique and proprietary systems and processes.

**COUNT I: FRAUD**

97.    Plaintiffs reassert the forgoing paragraphs herein.

98.    Defendants fraudulently induced Plaintiffs to enter into the UPA.

99.    Defendants also committed fraud by failing to disclose material issues as outlined herein.

100.    Those representations and failures to disclose were material to Plaintiffs, which entered into the UPA, acquiring CWT LP as a result of the fraudulent statements.

101.    Defendants knew they were representing falsely to Plaintiffs and they knew that they were withholding the vital information outlined herein.

102.    Defendants intended that Plaintiffs rely on their statements and nondisclosures and Plaintiffs acted reasonably in doing so.

103.    Plaintiffs did not know at the time that Defendants' statements were false and that Defendants had withheld the vital information outlined herein.

104.    Plaintiffs relied on the statements in entering into the UPA, acquiring and attempting to run CWT LP.

105.    Plaintiffs were entitled to rely on these statements and nondisclosures.

106.   Plaintiffs were consequently and proximately injured by being induced into the UPA, acquiring and attempting to run CWT LP which did not have the capabilities and assets that Defendants assured Plaintiffs that it had.

### COUNT II: NEGLIGENT MISREPRESENTATION

107.   Plaintiffs reassert the forgoing paragraphs herein.

108.   Defendants acted in the course of their business in representing to Plaintiffs the statements outlined herein.

109.   Defendants were thereby supplying false information to Plaintiffs in order to guide them into agreeing to the UPA.

110.   Plaintiffs justifiably relied on the statements as outlined herein.

111.   Defendants failed to exercise reasonable care or competence in communicating the information to Plaintiffs.

112.   Plaintiffs were consequently and proximately injured by being induced into the UPA, acquiring and attempting to run CWT LP which did not have the capabilities and assets that Defendants assured Plaintiffs that it had.

### COUNT III: BREACH OF CONTRACT

113.   Plaintiffs reassert the forgoing paragraphs herein.

114.   The parties entered into the UPA as outlined herein.

115.   Defendants breached that agreement as outlined herein.

116.   As a result of Defendants' breach, Plaintiffs were consequently and proximately injured.

### COUNT IV: BREACH OF IMPLIED WARRANTY OF GOOD FAITH AND FAIR DEALING

117.   Plaintiffs reassert the forgoing paragraphs herein.

118.   Implied into every contract is a covenant of good faith and fair dealing.

119.   Defendants breached that covenant as outlined herein.

120.   As a result of Defendants' breach, Plaintiffs were consequently and proximately injured.

## **DEMAND FOR A JURY TRIAL**

Pursuant to Rule 38, Fed.R.Civ.P., Plaintiffs demand a jury trial for all issues triable to a jury.

WHEREFORE, having answered Plaintiffs' Complaint, Defendants pray for judgment of the Court as follows:

A.  For compensatory damages as described herein.

B.  Plaintiffs may be entitled to punitive damages if it is determined that the tort claims herein rose to a level of aggravated or outrageous conduct and that the Defendants pursued a course of action by which Defendants knowingly and consciously disregarded a substantial risk of significant harm.

C.  For interest on any judgment at 10% per annum from the date of entry of judgment until paid.

D.  For pre-judgment interest at the statutory rate.

E.  For an award of taxable costs.

F.  For an award of attorney's fees.

G.  For interest on costs and fees at 10% per annum (or the highest statutory rate allowed by law) from the date of entry of judgment until paid.

H.  For trial of this matter to a jury.

I.  For such other relief as the Court deems proper.

**RESPECTFULLY SUBMITTED** this 31st day of March, 2017.

**WILENCHIK & BARTNESS, P.C.**

*/s /Brian J. Hembd.*
Dennis I. Wilenchik, Esq.
Brian J. Hembd, Esq.
David A. Timchak, Esq.
2810 North Third Street
Phoenix, Arizona 85004
*Attorney for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on March 31, 2017, the foregoing document was electronically transmitted to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the individuals registered.

/s/ Wendy L. Echols